Ralph DATHE, Plaintiff and Appellant,

v.

**WILDROSE SCHOOL DISTRICT NO. 91,**
a public corporation, et al., Defend-
ants and Appellees.

Carol MING, Plaintiff and Appellant,

v.

**WILDROSE SCHOOL DISTRICT NO. 91,**
a public corporation, et al., Defend-
ants and Appellees.

**Civ. Nos. 8946, 8947.**

Supreme Court of North Dakota.

April 30, 1974.

Rausch & Chapman, Bismarck, for plaintiffs and appellants.

Rolfstad, Winkjer, Suess, McKennett & Kaiser, Williston, for defendants and appellees.

VOGEL, Judge.

These cases, which were consolidated for trial and for argument on appeal, involve the statutory construction of Section 15–47–38, N.D.C.C., prior to its 1973 amendment. The statute, in its pre-1973 version, is set out in full in Hennessy v. Grand Forks School District No. 1, 206 N.W.2d 876 (N.D.1973).

The application of this statute poses a conundrum for school boards and teachers alike. What is the meaning of the first subsection, replete with pious hopes and exhortations, but lacking all language indicative of the creation of legal rights? It "urges"—but does not require—school boards to adopt policies to insure that channels of communication exist, and states a legislative "intent"—but not a legislative mandate—that "recognition be given" to damage to the reputation of teachers that can result from nonrenewal of their contracts, as well as a legislative "intent"—but not a legislative direction—that boards take action with "consideration and dignity" and give maximum consideration to "basic fairness and decency" in making decisions as to discharge or nonrenewal.

The language of the first subsection of the statute is hortatory and precatory, but not mandatory.

The second subsection of the statute contains legislative requirements that the board notify the teacher in writing of its contemplated nonrenewal of the teacher's contract at least ten days prior to the final date to renew the contract (which is specified as April 15 of each year by Section 15–47–27, N.D.C.C.). It requires that the teacher be informed in writing that he may request, and appear at, a meeting to be held by the school board prior to the final decision not to renew the contract. It requires that the school board "shall give an explanation and shall discuss at such meeting its reasons for the contemplated decision of the board . . ." It further requires that the meeting be an executive session of the board unless both the school board and the teacher requesting the meeting agree that it shall be open to other persons or the public, and further provides that the teacher may be represented at the meeting by a person of his own choosing. These are mandatory legislative requirements.

The statute was interpreted by this court in Hennessy v. Grand Forks School District No. 1, supra. We there held, inter alia, that North Dakota teachers are not tenured, that the only statutory requirement for a teaching contract is the holding of a current teacher's certificate, and that nonrenewal of contracts of teachers is discretionary with the school board; that Section 15–47–38 does not provide for a hearing or evidentiary proceeding; and that it does not require "procedural due process rights." We are not asked in this case to reverse Hennessy, but to clarify it. Neither are we asked here to enter into constitutional issues which we held were inapplicable in Hennessy.

The plaintiffs in the two separate actions here before us were teachers hired by Wildrose School District No. 1 and they taught under contract during the school year 1971–1972. At a meeting of the school board on March 6, 1972, the board directed the superintendent to write the two teachers that the board contemplated

not offering them a contract for the 1972–1973 year. The letters were written the following day. On March 24, separate meetings were held with each of the teachers at their request, and a representative of each attended the meetings. The superintendent of the school district also attended and acted as spokesman for the board. The following day, letters were directed to each of the teachers advising them of the decision of the board not to renew their contracts.

Thus it will be seen that all of the strictly procedural steps required by 15–47–38 were taken in time—notice of contemplation of nonrenewal, meeting with the teacher, and final action—and all of this was done prior to April 15, the last date allowed for final action by 15–47–27.

Why, then, this appeal? Because the appellants say that they are entitled to more than just going through the procedures required by the second subsection of 15–47–38; because they claim that they are also entitled to the "consideration and dignity" and "maximum consideration to basic fairness and decency" specified in the first subsection of the statute, and that they did not receive them.

They also claim that the statute was violated by allowing the superintendent to attend the meeting, which the statute says shall be an executive session, and allowing him to speak for the board.

We will summarize the treatment they received, according to the affidavits upon which the summary judgments of the district court were based. The affidavits were submitted by the teachers. The board submitted affidavits identifying the minutes and the membership of the board, and nothing more. The board thereby established its compliance with the procedural requirements of Subsection 2 of 15–47–38.

The teachers submitted their own affidavits and, in more detail, the affidavits of their chosen representatives, also representing the North Dakota Education Association, who attended the meeting at their request and pursuant to statutory permission.

The pertinent parts of the affidavits of the representatives of the North Dakota Education Association are set forth in full below. In the case of Mr. Dathe, they constitute the entire evidence before the trial judge as to the occurrences at the meeting between the teacher and the board. In the case of Mrs. Ming, the affidavit of the representative of the North Dakota Education Association is supported by an affidavit of Mrs. Ming which generally corroborates that of the representative.

### DATHE EVIDENCE

"That this affiant then entered the hearing room with Mr. Dathe and the superintendent, Donald Emch, who was asked by the superintendent to give the reasons for the non-renewal of the Dathe contract; that Mr. Emch then cited as the first reason for the non-renewal 'lack of discipline'; that Mr. Emch stated that Mr. Dathe had 'lost control of his classroom'; that this affiant then asked Mr. Emch what criteria he used to evaluate Mr. Dathe and Mr. Emch's reply was that it was his opinion that Mr. Dathe did not have good discipline; that this affiant then again asked him what procedure he used for evaluation and Mr. Emch replied that he did not have to explain how he evaluated his teachers; that Mr. Emch did not explain or indicate that he had been in Mr. Dathe's classroom to observe but to the contrary, Mr. Dathe said that while Mr. Emch had been in and out of his classroom to get a child to run an errand, he had not been in the classroom for the purpose of observation and he further advised that in industrial arts he lets the children work in pairs and that he does not interrupt the grade he is teaching unless the other grade is doing something to disrupt his teachings; that at this point the school board president, Mr. Salveson, interjected to say that they had hired Mr. Emch as administrator and if in his opinion he said Mr. Dathe had poor discipline, that was good enough for them; that at this point the

discussion was cut off by the school board president;

"That the next stated reason was that the Plaintiff was deficient in his subject matter knowledge and had poor motivation of the students and the students did not pay attention to him; it was also said that Mr. Dathe was a below average teacher and did not think of the welfare of the students; that there was no attempt on the part of Mr. Emch to justify this charge and he simply said that he was able to observe from the hall before school and after school; Mr. Dathe pointed out that he had given his 5th and 6th grade students SRA tests in the first month of school and that they did very poorly at that time; that within the last few weeks just prior to the hearing, the tests were given again and some of the same students scored at the 8th and 9th grade level and most of them were above their previous level; that Mr. Dathe thought that he was doing a good job with young people and thought that if he wasn't motivating them they would not be learning as well as they were; that this affiant again brought up that most good schools have an evaluation program for their teachers and that this program was used to improve the teaching climate but Mr. Emch said that he had seen the NDEA recommended forms and thought they were all right but after a teacher had his degree he should know when he is doing something wrong and the superintendent should not have to tell him;

"That the third reason for the non-renewal was given as being unable to spell and speak correctly; that the superintendent gave as an example that Mr. Dathe had made a mistake on one of his report cards and that on the request for a hearing he did not capitalize school board and left out the comma after the word sincerely;

"That the superintendent listed as the next charge that his general judgment was poor and that the teachers were told where they could smoke and where they could not and that Mr. Dathe was smoking in his classroom one evening before room visita-tion; that Mr. Dathe said that he was smoking prior to the time the parents came in and if he wished to smoke when the parents were there he always asked for permission; that Mr. Emch said that this was a minor point anyway;

"That Mr. Emch then said Mr. Dathe's general industry was poor and he needed to show more energy on the job; that Mr. Dathe pointed out that he usually shows up between 7:30 and 8:00 o'clock in the morning and leaves from 5:00 to 6:00 o'clock in the afternoon so that he could prepare his classes for the next day; that Mr. Emch, in reply to this, said that he was there longer than anyone else during the day and stayed until after everyone had left; that the school board president said that this is what they hire an administrator for;

"That the superintendent then cited as another reason poor tact; that the superintendent gave as an example of this that at a hearing or meeting with a health insurance carrier, Mr. Dathe asked the amount of the premium; that when he was told what the premium would be, he said that on his salary it would be impossible to fit this into the budget; that when this affiant attempted to question Mr. Emch with regard to this point, the school Board president cut the question off by saying that it was not one of the major items for the non-renewal;

"That the last reason given was general lacking of good leadership; that there was very little discussion on this item and no example was given by the superintentent;

"That at this point the president of the school board cut off the hearing with the statement, 'That the law required a hearing and that we had just had one.'; that the hearing was then terminated; that no board member participated in the discussion except the president and they did not seem to be interested in being there; that there was no opportunity to cross examine the superintendent or extend the discussion beyond that which was hereinbefore been set forth;

"That this affiant believes that the school board members felt that they merely had to fulfill an obligation of the law in holding this hearing; that there was no discussion between the board and the teacher with regard to the reasons given and that the board simply relied upon its superintendent." [Affidavit of Ted Gray, NDEA representative, who appeared with Mr. Dathe.]

## MING EVIDENCE

"That the first stated reason by Mr. Emch was 'lack of discipline'; that this Affiant requested that Mr. Emch gave examples of this purported charge and this Affiant said, 'Can you give us any specific examples of what you are telling us about'; that Mr. Emch replied, 'I don't have to' and continued, 'I am superintendent, I'm around the school and that in itself allows me to make these judgments'; that this Affiant then stated, 'Don't you feel that Mrs. Ming should have pointed out to her some specific examples because she could have some justifiable reason for what you refer to'; that Mr. Emch then replied that 'there was noise in the room', and he then said that on one occasion 'he walked into the classroom and students were milling all around'; that Mrs. Ming then replied that on that particular occasion the students were 'having a drawing and painting exercise and that on such occasions the students are allowed to do their own creative thing'; that Mr. Emch gave no further examples, even on request; that this Affiant met in the room used by the Plaintiff, which is located next to the superintendent's office and that the walls seem to be quite thin and noise but not words could be heard through the wall; that Mr. Emch was not able to give an example of parental complaint with regard to discipline;

"That Mr. Emch then gave us a second reason 'lack of tact'; that when pressed on this point Mr. Emch could give no incident but did say that Plaintiff was a 'meddler' and 'spent too much time in my office'; that Plaintiff pointed out that she had no idea that he felt this way and pointed out

that he had never told her of his feeling in this regard; that there was no indication that this was ever done when Plaintiff was assigned elsewhere; that Mr. Emch replied that 'You are a teacher, you are a graduate from college and I shouldn't have to tell you that'; that Plaintiff then pointed out that she was of Norwegian stock and that 'I try to be friendly with everyone'; that Mr. Emch then also referred to an incident when he came into the office and found her looking in the files but she pointed out that she was looking for a catalog and then she was amazed that he found this objectionable since this was the place that these things were kept; that Mr. Emch did not dispute this point; that he also mentioned an instance of a concert where a patron of the school district had come up to the Plaintiff and complimented her for a good job and the Plaintiff replied 'of course, what did you expect'; that Mr. Salveson [president of the school board] then stated, 'Well, I think that we have discussed this enough and I think Mr. Emch has covered this';

"That the next reason was 'poor classroom technique'; that Mr. Emch could give no specifics on this; that he admitted that he had made no formal evaluations and that no one else had made such evaluations and he admitted that he had not discussed the matter with the teacher; that, rather, he said, 'I am the superintendent and I am around the school';

"That the next reason given was the personal life of the Plaintiff or, specifically, that of her husband; there was some reference to some unpaid bills and the fact that the Plaintiff's husband had a drinking problem; that Mr. Emch stated that he had been getting calls from a utility company in another city with regard to an unpaid bill; that Mrs. Ming stated that when she found the bill had not been taken care of by her husband, she took care of it; that Mr. Emch stated in his opinion that this problem had affected her teaching and when asked as to how he knew this, he replied, 'I am the superintendent';

"That Mr. Emch then stated that 'It is well known that the NDEA enjoys taking on superintendents'; that this Affiant informed Mr. Emch that this was not the policy of NDEA and that 'I am not a member of the staff of NDEA and I am here because I am concerned'; that the matter was then dropped;

"That Mrs. Ming was informed by Mr. Salveson that the board had no complaint about her music teaching but only about the manner in which she taught the 5th and 6th grade room;

"That to the best recollection of this Affiant this was the substance of the conversation at the meeting with the Plaintiff and the board; that none of the other members of the board spoke and they seemed inattentive to the proceedings;

"That this Affiant attempted to get the board to discuss with the Plaintiff the reasons for her non-renewal but that the board refused to do so except as hereinbefore set forth; that this Affiant got the impression that the board considered the hearing a formality that they had to go through and that they only wanted to get the hearing over with." [Affidavit of Robert Boyd, NDEA representative, who appeared with Mrs. Ming.]

With this factual background, and keeping in mind the holdings of *Hennessy* summarized above, we must decide whether the first subsection of 15–47–38 gives the teachers anything at all, other than containing an admonition to the school boards to "be good," coupled perhaps with an implied threat to give the teachers specific rights in the future if the school boards fail to "be good."

■ Using the facts in this case as an example of possible evils which the Legislature may have had in mind, we perhaps can find something concrete in the general admonitions and exhortations of the statute. We do not believe that the Legislature meant that school boards should have the power to refuse contract renewal to a teacher because of a dislike of the color of her hair, as one of the parties suggested they have. We believe the Legislature at least intended that the reason for nonrenewal should be a reason related in some way to the ability, competence, or qualifications of the teacher as a teacher, or the necessities of the district such as lack of funds calling for a reduction in the teaching staff, and that the reason be one that at least is capable of articulation at a meeting. The reason should not be irrelevant to teaching, as the failure of a husband to pay his bills would be, and it should not be based upon mere suspicion of misconduct unrelated to the ability of the teacher to teach, as in Fisher v. Snyder, 476 F.2d 375 (8th Cir. 1973). By citing the *Fisher* case, we do not mean to join in all it says, particularly as to the constitutional aspect of the case, which we have held does not exist under our statute. See *Hennessy, supra,* 206 N.W.2d at p. 884, citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L. Ed.2d 548 (1972). Nor do we hold that the board has a burden of proof or that charges must be filed. But we do hold that it has a burden to articulate a reason and to relate that reason to teaching competence or the needs of the district, as well as to comply with the other provisions of Subsection 2, requiring the board to offer to meet with the teacher, to hold the meeting if requested, and to withhold a final decision until after the meeting.

All of this surely is little enough to do in view of the remonstrances of the Legislature to be fair and decent and dignified and considerate.

We believe that the foregoing minimum standards are required by the use of the words "explanation," "discuss," and "reason" in Subsection 2 of the statute.

We have also considered Scheelhaase v. Woodbury Central Community School District, 349 F.Supp. 988 (N.D.Iowa 1972), cited by the teachers. We believe it is not in point, since it holds that in Iowa a teacher has a "property interest" in a con-

tract of employment, while we have held to the contrary. Hennessy v. Grand Forks School District No. 1, *supra*.

 Applying the minimum standards we have suggested to the cases before us, we find that the teachers here were given the rights provided by the Legislature, although marginally. They had their meeting with the board and .the final decision by April 15. They were given "reasons" and there was a minimal discussion of them (even though the discussion really came down to an acceptance of the judgment of the superintendent), and the reasons (except for the bill-paying habits of Mrs. Ming's husband and one or two other trivial allegations) related to teaching competence and functions. The final decision may reflect as much, or more, on the board as on the teachers, but the decision was for the board to make. See Ferris v. Special School District No. 1, 367 F.Supp. 459 (D. Minn.1973).

We note that the 1973 amendments to Section 15–47–38 contain a new provision, "The determination not to renew a contract if made in good faith shall be final and binding on all parties." We do not, of course, express an opinion as to the legal effect of this new provision, since the actions before us arose under prior law.

 The teachers complain that the superintendent was allowed to attend the meeting and participate, even though the statute requires that the meeting "shall be an executive session of the board" unless the parties agree to the contrary. The parties did not agree to the contrary.

 We hold that allowing the superintendent to attend the meeting did not effect its character as an "executive session." An "executive session" is one from which the public is excluded and at which only such selected persons as the board may invite are permitted to be present. Blum v. Board of Zoning and Appeals of Town of North Hempstead, 1 Misc.2d 668, 149 N. Y.S.2d 5, 8, (1956); Thomas v. Board of

Trustees of Liberty Township, 5 Ohio App.2d 265, 215 N.E.2d 434, 436 (1966). We believe that the presence of the superintendent was proper and that no error was committed in allowing the superintendent to state the reasons for his recommendation that the contracts not be renewed. Such a procedure would seem to be more conducive to fairness than, for example, merely reading a statement from the superintendent in his absence.

Affirmed.

ERICKSTAD, C. J., and TEIGEN and PAULSON, concur.

KNUDSON, J., concurs in the result and the syllabus, except Syllabus 2.