**Ellis Dwight WILLIAMS, Plaintiff,**

v.

**Mason DAY et al., Defendants.**

No. J–73–C–64.

United States District Court,
E. D. Arkansas,
Jonesboro Division.

March 31, 1976.

Eugene R. Warren, Warren & Bullion, Little Rock, Ark., for plaintiff.

Bill Penix, Penix & Penix, Jonesboro, Ark., Gardner & Steinsiek, Blytheville, Ark., for defendants.

## MEMORANDUM

EISELE, Chief Judge.

In his complaint the plaintiff states that the defendants unlawfully failed to renew his teaching and coaching contract in the Blytheville school system for the 1973–74 school year. He alleges, *inter alia*, that he was "terminated by nonrenewal for constitutionally impermissible reasons" as follows:

"1. His termination was based upon the exercise by him of his right of freedom of speech guaranteed to him by the Constitution of the United States, Amendment One.

"2. His termination was based at least in part upon his appeal to school board members for action by the school board in protecting students under his supervision and control from mistreatment by other members of the faculty. Plaintiff was employed by the school board and to punish him for appealing to his employer for protection of his students is arbitrary and capricious.

"3. His termination was based upon, at least in part, an alleged report by him to the Arkansas Activities Association of violations by other faculty members of regulations of the Arkansas Activities Association. Plaintiff asserts that he requested an interpretation of Arkansas Activities Association regulations since as a member of the coaching staff of Blytheville High School he was subject to penalties assessed by Arkansas Activities Association for violations by Blytheville High School of the regulations of said Association.

"4. His termination was based, at least in part, on the fact that actions by other faculty members would cause students under his protection to be delayed at the school grounds after a period leading into the darkness and that he believed as a teacher he should notify the parents of his students why their children were being held at the school premises until such late hour.

"5. His termination was based, at least in part, to his exercise of freedom of speech in objecting to a verbal attack by a spectator upon one of his players who happened to be his son, such verbal attack having been made in the presence of his wife."

Plaintiff further alleges:

"12. The action by the Board in terminating the coaching career of plaintiff at Blytheville High School for the exercise of freedom of speech and particularly for the protection of the pupils under his supervision and control will have a chilling effect upon the rights of other teachers to exercise their constitutional right of freedom of speech and to exercise their rights and responsibilities to defend the rights and safety of pupils in their charge.

"13. Plaintiff asserts that his dismissal was arbitrary and capricious. That the so-called 'reasons' were pretextuous [sic] and a facade. Plaintiff further asserts that the allegation of insubordination made against him was not proved and indeed no direct testimony sustaining such false and inflamatory [sic] assertion was produced at the hearing.

"14. Plaintiff states that the charges of insubordination in coaching made against him (which were unsubstantiated) reflected upon his character and his competency as a coach and amounted to a deprivation of his liberty as guaranteed by the Constitution of the United States, and placed a stigma upon him which severely damages his ability to obtain and keep employment at other schools."

Mr. Williams also contends that his termination was unconstitutional and void in that he was denied procedural and substantive due process. The particular allegations are as follows:

"15. Plaintiff states that his termination was unconstitutional and void in that he was denied procedural and sustantive [sic] due process of law as required by the 14th Amendment to the Constitution of the United States which requires that a

teacher be given a prior termination notice setting out in specific details the reasons why the teacher's career will be terminated by a failure to renew the teacher's contract and that the teacher be afforded a proper hearing at which hearing the evidence must sustain the charges, particularly where the charges place a stigma upon the character and reputation of the teacher.

"16. The failure of the Board to provide the plaintiff with constitutionally permissible and specific reasons for its actions and to provide him with a due process hearing is allegedly based upon Arkansas Law which defendants assume permits the termination of plaintiff's contract or the contract of every teacher upon a simple notice of intention not to renew such contract."

Plaintiff alleges that the defendants have subjected him to deprivation of rights, privileges and immunities secured to him by the Constitution and laws of the United States. He also states his view of the effect of an act of the 1970 Arkansas General Assembly as follows:

"18. Plaintiff states that Act 74 of 1970 requires that the school board give to the teacher who is to be terminated notice and hearing and that such notice and hearing constitutes 'property' protected by the Constitution of the United States. Plaintiff states that the hearing guaranteed him by Act 74 and protected by the Constitution of the United States means a due process hearing which requires that he be given an adequate notice in specific detail as to what he must defend himself against; that the charges against him must be proved by substantial evidence; and that he not be terminated arbitrarily or capriciously."

Along with their answer the defendants filed a "motion to dismiss and for judgment on the pleading". The motion was overruled. The answer essentially denies that plaintiff's contract was unlawfully not renewed and denies that the decision not to rehire was based on constitutionally impermissible reasons. The answer further states:

"Defendants, vested by Arkansas law with the responsibility of operating the Blytheville School District, simply decided it was not in the school's or students' best interests to grant or extend a new contract to plaintiff. Accordingly, plaintiff was not rehired. This was a legal decision that could only be made by the defendant School Board pursuant to Arkansas law."

The case was tried to the court on February 21, 1975. The parties were given the opportunity to file additional memoranda, and the case was taken under submission.

The evidentiary presentation by the plaintiff at the trial of this cause suggests to the Court that he has fully committed himself to the legal theory expressed in his pre-trial brief as follows:

"This hearing, therefore, should be confined to an introduction of the record furnished to the plaintiff plus proof of damages sustained by the plaintiff as mitigated by earnings from other sources.

" 'It is "a simple but fundamental rule of administrative law . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." '

"*Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 270 [80 S.Ct. 1122, 1126, 4 L.Ed.2d 1208, 1213] (1960); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999] (1947); *SEC v. Chenery Corp.*, 318 U.S. 80, 87 [63 S.Ct. 454, 459, 87 L.Ed. 626, 632] (1943); *Westminster Broadcasting Corp. v. FCC*, 148 U.S.App.D.C. 332, 336, 459 F.2d 1356, 1360 (1972); *UAW, Local 833 v. NLRB*, 112 U.S.App.D.C. 107, 113, 300 F.2d 699, 705 cert. denied, 370 U.S. 911 [82 S.Ct. 1258, 8 L.Ed.2d 405] (1962); *NLRB v. Capital Transit Co.*, 95 U.S.App.D.C. 310, 313, 221 F.2d 864, 867 (1955); *Democrat Printing Co.*

*v. FCC*, 91 U.S.App.D.C. 72, 77–78, 202 F.2d 298, 302–03 (1953); *Mississippi River Fuel Corp. v. FPC*, 82 U.S.App. D.C. 208, 224, 163 F.2d 433, 449 (1947)." The Court disagrees with the plaintiff's theory as to the role of the court in a Section 1983 case, such as this. At the hearing the Court gave the plaintiff every opportunity to substantiate the allegations contained in his complaint. Plaintiff chose to rely on the record of the hearing before the school board with respect to all issues except the issue of damages.

■ It is obvious that a *plaintiff-teacher* in a Section 1983 employment termination case is *not* limited to the transcript of any administrative hearing in proving, or attempting to prove, that the real reason for termination was, say, his race or his exercise of First Amendment rights. By the same token the defendants are not limited solely to the record of the administrative hearing—usually much more abbreviated than the one in this case—in an effort to bring before the Court all of the facts and circumstances so that the Court can determine if the discharge was based on constitutionally impermissible grounds. The Court here is not simply reviewing an administrative determination.

■ After hearing all of the evidence in the case, including a review of the transcript of the hearing before the school board, the Court is convinced that the plaintiff's contract was not renewed for the most mundane of personnel considerations. The decision was not in any way based upon the plaintiff's exercise of his First Amendment rights.[1] The evidence indicates that the plaintiff became very dissatisfied with his situation and status the moment he

learned, in early 1971, that Bill Mayo—not Williams—was to become the athletic director effective in July, 1971. He could not tolerate the situation, feeling that he merited the appointment. From that point forward he refused to cooperate with the administration, failed to conform his conduct to the reasonable requirements and standards established by those above him in the administrative hierarchy, and generally showed a lack of personal control and respect for the attitudes and rights of others in the school "family" (including students, teachers, administrators and patrons) which ultimately created an intolerable situation for the athletic director, the principal, the superintendent, and the school board.

The First Amendment allegations having been found to be without merit, plaintiff is left with his arguments: that Act 74 of 1970 conferred upon him a property right or, alternatively, that the implementation of Act 74 stigmatized him and deprived him of "liberty", thus, in either case, entitling him to the protection of the procedural and substantive due process requirements of the United States Constitution. These contentions force us to consider the effect of *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Buhr v. Buffalo Public School District*, 509 F.2d 1196 (8th Cir. 1974); and *Evans v. Page*, 516 F.2d 18 (8 Cir., 1975).

Assuming a case arose in Arkansas where the facts were identical to those in *Buhr*, would our Court of Appeals have reached a different decision because of the differences between the state law of North Dakota and the state law of Arkansas?

We note from the opinion in *Buhr*, under applicable North Dakota law, there is no

---

1. Federal courts must be vigilant to protect the First Amendment rights of all of our citizens. But they must also be careful not to permit the use of speech to become a cloak for protection against the consequences of one's misconduct or incompetency. In every teacher dismissal or nonrenewal case, elements of speech may be involved. The Court's obligation is to determine from all the evidence if the board's decision was based in whole or in part on the teacher's exercise of his First Amendment rights. In other words, the Court must determine the *real* reason for the board's action. *See, e. g., Miller v. Pulaski County Special School District*, No. LR–72–C–249 (E.D.Ark.), aff'd 513 F.2d 637. The burden is on the teacher to show that the stated reasons for nonrenewal were pretexts, and that the actual reason was the exercise by the teacher of a constitutionally protected right. *Watts v. Board*, 495 F.2d 384 (8th Cir. 1974).

formal tenure system. Each public school teacher is employed under a yearly contract which the school district may or may not renew. The identical situation obtains in Arkansas. In *Nethercutt v. Pulaski County Special School District*, 251 Ark. 836, 475 S.W.2d 517 (1972), the Arkansas Supreme Court construed § 80–1304(b), Ark.Stat. Ann. (Supp.1971), which defines the contractual rights of public school teachers as follows:

"As we construe this statute, a school board, as it may be constituted following any school election, is free to reemploy or terminate any teacher with or without cause. A school board, having only such authority as is granted it by law, cannot by the adoption of a teacher tenure policy give to a teacher a tenure beyond or greater than that authorized by the law limiting such employment to an annual contract."

251 Ark. 841, 475 S.W.2d 521. *See also Freeman v. Gould Special School District*, 405 F.2d 1153, at 1158–59 (8th Cir. 1969).

In 1971, North Dakota enacted a statute which provided:

"The school board of any school district contemplating discharging a teacher prior to the expiration of the term of the teacher's contract, or contemplating not renewing a teacher's contract shall notify such teacher in writing of such fact at least ten days prior to the date of discharge or final date to renew the teacher's contract. Such teacher shall be informed in writing that he may request and appear at a meeting to be held by the school board prior to the final decision of such teacher's discharge or failure to renew such teacher's contract. The school board shall give an explanation and shall discuss at such meeting its reasons for the contemplated decision of the board in discharging such teacher or refusing to renew the teaching contract of the teacher. The meeting shall be an executive session of the board unless both the school board and the teacher requesting such meeting shall agree that it shall be open to other persons or the public. The teacher may be represented at the meeting by a person of his own choosing. If the teacher so requests, he shall be granted a continuance of not to exceed seven days by the board, unless for good cause otherwise shown. No cause of action for libel or slander shall lie for any statement expressed either orally or in writing at any executive session of a school board held for the purposes provided in this section."

In 1970, the Arkansas legislature enacted a statute, the pertinent portions of which are as follows:

"When a local school board terminates or dismisses a teacher, the board shall notify the teacher in writing, and if the board determines not to renew the contract of a teacher for another academic year, it shall notify the teacher thereof in the manner and within the time prescribed by Section 80–1304, Ark.Stats. The board may include with such notice a statement of the reasons for such termination or dismissal, or for the determination not to renew the contract of the teacher. If the board does not include such statement with the notice, the teacher may file a written request with the board within ten (10) days after receipt of the notice from the board, for a statement of the reasons of the board for such dismissal, termination or refusal to renew the contract. Upon receipt of such request in writing, the board shall, within five (5) days after receipt of the request, furnish to the teacher a written statement of the reasons for such dismissal or termination or decision not to renew the contract of the teacher.

"Any teacher who is dismissed or terminated, or whose contract is not renewed for the next academic year, and who is notified thereof by the school board in the manner prescribed by law, may file a written request with the board for a hearing. Such written request for a hearing shall be sent by certified mail to the president of the school board, with a copy to the superintendent, within thirty

(30) days after the written notice of dismissal or termination of contract is received by the teacher.

"The hearing before the school board shall be conducted in accordance with the following provisions:

"(a) The hearing shall take place not less than five (5), nor more than ten (10) days after the written request therefor has been served on the school board, except that the teacher and the school board may, in writing, agree to a postponement of such hearing to a date agreed to by the school board and the teacher.

"(b) The hearing shall be private unless the school board or the teacher shall request that the hearing be public, in which case a public hearing shall be held at the request of the school board or the teacher.

"(c) The teacher and the school board may be represented by legal counsel.

"(d) It shall not be necessary that a full record of the proceedings at the hearing be made and preserved unless:

"(1) The school board shall elect to make and preserve a record of the hearing, at its own expense, in which event a copy thereof shall be furnished the teacher, upon request, without cost to the teacher,

"(2) A request is filed with the school board by the teacher in writing at least 24 hours prior to the time set for the hearing, in which event the school board shall make and preserve, at its own expense, a record of the hearing, and shall furnish a copy thereof to the teacher without cost to the teacher."

Again, would the differences in the Arkansas statute and the North Dakota statute constitute a basis for a different result assuming, as we have stated, a factual situation arose in Arkansas identical to that found in the *Buhr* case? One of the answers to this question may be that the facts could not be identical in Arkansas beyond a certain point since the dissatisfied teacher in Arkansas would have procedures available to him which would not be available to a teacher in North Dakota and that, therefore, in the course of the progress of the case the facts would of necessity have to vary. However, this Court is of the opinion that this circumstance should not change the result and that it would be strange indeed if a contrary decision were based on such circumstances.

The North Dakota act and the Arkansas act appear to have essentially the same objectives: give the teacher the right to learn the reasons for the nonrenewal of his or her contract and a chance to meet with the board, which "meeting" or "hearing" would provide an opportunity to the teacher to bring out all of the facts in an attempt to convince the board that it should change its decision or contemplated decision and, in fact, renew the contract.

The North Dakota statute provides that the school board, contemplating not renewing a teacher's contract, shall notify such teacher in writing of such fact at least ten days prior to the final date to renew the teacher's contract. The Arkansas statute provides that, if the board determines not to renew the contract of a teacher for another academic year, it shall notify the teacher thereof in the manner and within the time prescribed by § 80–1304, Ark. Stats. The pertinent portion of the latter statute provides:

"Every contract of employment hereafter made between a teacher and a board of school directors shall be renewed in writing on the same terms and for the same salary, unless increased or decreased by law, for the school year next succeeding the date of termination fixed therein, which renewal may be made by indorsement on the existing contract instrument; unless during the period of such contract or within ten (10) days after the termination of said school term, the teacher shall be notified by the school board in writing delivered in person or mailed to him or her at last and usual known address by registered mail that

such contract will not be renewed for such succeeding year . . .."

The North Dakota law states that the teacher may request to "appear at a meeting to be held by the school board prior to the final decision", and that the school board shall give "an explanation and shall discuss at such meeting its reasons for the contemplated decision of the board in . . refusing to renew the teaching contract of the teacher."

The Arkansas act states that the board may include with its notice a statement of the reasons for its determination not to renew the contract. If the board does not include such a statement of its reasons with the notice, the teacher may file a written request for a statement of the reasons of the board for refusing to renew the contract, and the board must then furnish the teacher a written statement of those reasons. The Arkansas act then goes on to provide that any teacher whose contract is not renewed may file a written request with the board for a "hearing". The Arkansas statute does not flesh out the meaning of the word "hearing" any more than the North Dakota statute fleshes out the meaning of the word "meeting". In each case it is provided that the meeting or hearing will be private unless there is a request that it be public. Under the North Dakota law *both* parties must request that the meeting be open to other persons or the public; whereas under the Arkansas act a public hearing is required if requested by either the school board or the teacher. However, in Arkansas as well as North Dakota the teacher can learn the reasons for termination or nonrenewal *privately*. But if the teacher wants a hearing in Arkansas, the board can require a *public* hearing even if the teacher requests a private hearing. This possible distinction does not come into play here since it is clear from the record that a public hearing was held because of the *plaintiff's request* therefor.

■ First, let us examine plaintiff's "property interest" contention. Arkansas has no formal tenure system. Does Act 74 of 1970 create a property interest? Prior to *Buhr* plaintiff could rely upon several federal court decisions in advancing such a contention.[2] As stated above, no Arkansas court has yet had the opportunity to give content to the term "hearing" as used in Act 74. It should not be assumed that the state courts would interpret the act to provide full-dress, constitutionally defined procedural due process, especially so if to so interpret it would in effect create tenure which the Arkansas legislature has consist-

2. Plaintiff's contention finds some support in a leading appellate opinion concerning nonrenewal of Arkansas teacher contracts. In *Freeman v. Gould Special School District*, 405 F.2d 1153 (8th Cir.), *cert. denied*, 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93 (1969), the court considered a district court denial of relief to plaintiffs asserting constitutional denials of equal protection and procedural due process. The district court determined the nonrenewal not to be racially motivated and the Arkansas law, prior to Act 74, to provide no procedural due process rights attendant to a decision not to renew a yearly teaching contract. In affirming the district court, the appellate majority noted that Arkansas law did not entitle plaintiffs to a hearing on nonrenewal as a matter of right and stated:

"Absent statutory or contractual requirements, persons discharged for inefficiency, incompetency, or insubordination have no constitutional right to a hearing with rights of cross-examination and confrontation of witnesses."

*Id.* at 1161. In dictum, however, the court stated:

"When a particular statutory procedure is set up for dismissal of a teacher it must be followed, but absent statutory procedures the Board may adopt its own method. 47 Am. Jur., *Schools* § 125 (1943)."

Id. at 1160. This language was relied on by Judge Miller after the enactment of Act 74 to reverse the result reached in *Freeman*. *See Appler v. Mountain Pine School District*, 342 F.Supp. 1131, 1137 (W.D.Ark.1972).

This court believes it must reconsider the issue in the light of *Buhr v. Buffalo Public School District*, 509 F.2d 1196 (1974), and in light of the ultimate impact of the theory, as stated, on principles of federalism. The state courts of Arkansas have not stated that Act 74 created any "property" right in continued employment. In fact, the Arkansas Supreme Court has indicated to the contrary. *See Nethercutt v. Pulaski County Special School District*, 251 Ark. 836, 475 S.W.2d 517 (1972).

ently refused to do over the years.[3]  As Judge Webster states in *Buhr*:

> "Yet it is clear that those same statutory provisions, which outline the procedures for terminating a teacher's employment, do not provide for full-dress procedural due process. *Dathe v. Wild Rose School District No. 91*, [N.D., 217 N.W.2d 781] *supra; Hennessy v. Grand Forks School District No. 1*, [N.D., 206 N.W.2d 876] *supra*. Where, as here, the only 'grant of a substantive right [to continued employment] is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant [challenging the termination of employment] must take the bitter with the sweet.' *Arnett v. Kennedy, supra*, 416 U.S. [134] at 153–54, 94 S.Ct. [1633] at 1644 [40 L.Ed.2d 15]. Because Ms. Buhr's only 'property interest' in reemployment 'was itself conditioned by the procedural limitations which had accompanied the grant of that interest,' 416 U.S. at 155, 94 S.Ct. at 1645, there is no merit to her claimed right to full procedural due process."

Act 74 provides certain limited procedural requirements that can be invoked by a teacher when his contract is not renewed. It cannot be fairly read as creating the full panoply of due process rights required by the United States Constitution.  It creates no property interest or claim of entitlement to renewal of a contract.

Turning to the "liberty" argument, it is quite clear that the Supreme Court will have to speak again before we fully understand all of the implications of *Roth*. The majority decision in *Roth* indicates a reluctance on the part of the federal courts to give nontenured teachers tenure without benefit of state law.  And yet, in its analysis of the teacher's right to "liberty" under the Constitution, they leave the door open to accomplish the same result which the majority in *Roth* conclude cannot be predicated upon the "property" provision.

It is suggested that there has not as yet been an adequate analysis of the causes of action being espoused by the teachers in the nontenured cases.  To state that a school board, pursuing procedural requirements mandated by state law and demanded by the teacher, which falsely and publicly stigmatize a teacher in connection with its decision not to rehire that teacher for another year must, as part of the remedy, re-employ or reinstate the teacher is to fail to properly analyze the basis of the complaint being made by the teacher or to properly analyze his rights in the premises.  In a nontenure situation where the courts concede that a board may not rehire a teacher for good reasons, bad reasons, or no reason at all (providing they do not fail to do so because of the teacher's race or because of the teacher's exercise of his constitutional rights), should the federal courts require the teacher to be reinstated upon a showing that the manner of notification or the procedure of the board in making known the reasons for its decision not to renew the contract stigmatizes the teacher by some false charge?  Let us assume that a school board refuses to renew a teacher's contract for the *privately* stated reason of the misconduct of the teacher in repeatedly being intoxicated while in her classroom.  Let us assume further that there is no basis in fact for the charge and that the real reason for not renewing the contract is that the superintendent wants to create a vacancy so that he can hire his brother-in-law.  (In connection with this last assumption, we can note that the "real" reason has nothing whatever to do with the teacher's exercise of her constitutional rights and is unrelated in any

---

**3.** Furthermore, even if the Arkansas act explicitly gave all of the procedural safeguards required by the due process clause of the United States Constitution—or indeed gave procedural rights in excess of such requirement—it is difficult to see how this circumstance could be said to create a property right in continuing employment in favor of nontenured teachers in the light of the clear intent of the Arkansas legislature to the contrary.  *Nethercutt*, cited above (stating that Arkansas school boards were "free to reemploy or terminate any teacher *with or without cause*") was decided *after* the enactment of Act 74.  Apparently no one even suggested that Act 74 had changed the law by permitting nonrenewal *only for cause*.

way to her race.) Then let us assume that the teacher demands a *public* hearing and the false charge is aired. What principle permits the *federal* court to intrude in this situation? If the state legislature and the state courts do not choose to provide any remedy of reinstatement in such cases, how can, and why should, the federal courts? [4]

The confusion may arise out of the unspoken assumption that the injured teacher has no remedy in such situations. This should be irrelevant to the precise issue raised. Furthermore, it is not generally so. There are actions for malicious slander and for wrongfully interfering with one's economic interests. If pursued successfully, they could result in large monetary verdicts in favor of the victims and against those responsible. But the remedy should not be to require the teacher's contract to be renewed absent state law providing such a remedy.

As a fact of life, it is hard to understand how any teacher whose contract is not renewed is not in some way stigmatized or at least handicapped thereby in his or her efforts to obtain future employment. But it is clear that, ". . . nonrenewal, standing alone does not constitute the deprivation of an interest in liberty." *Buhr*, at 1199. What is the "something else" that is required? Is it not the gratuitous, voluntary and public statements of the board? And, if so, are not state laws, such as Act 74, irrelevant to the constitutional issues raised?

In many nontenure states, the legislatures have passed laws, such as Act 74 of the Arkansas General Assembly of 1970, requiring the school board, upon request, to advise the teacher of the reasons for its decision not to renew the contract. In some states, such acts go forward, as does Act 74, to require a "hearing" at the request of the dissatisfied teacher. In those nontenure states *without* either type law, school boards can proceed under *Roth* without much difficulty since they, having no duty to state the reasons for their decision, can simply notify the teacher of their decision to not renew. Under this view, *Roth* would effectively protect school boards only in those states which do *not* require the board to give the teacher their reasons for nonrenewal. In states such as Arkansas, where the rule is to the contrary, it could be argued that *Roth* would avail little because the members of the boards will, in effect, be required to provide the predicate for a federal court case against themselves. But in the presence or in the absence of either type of state legislation, if the board voluntarily, gratuitously and publicly stigmatizes the teacher in stating reasons for nonrenewal, is it not depriving the teacher of "liberty" thereby triggering full constitutional due process remedies? For example, if a nonrenewed teacher in a nontenure state is publicly advised that the reason for nonrenewal was "drinking on the job," would the "liberty" or due process considerations be any different if that state had a disclosure law (such as Act 74) from that obtaining in another nontenure state having no such law?

There are two lines of analysis which would *not* require a different result in states where the basic law was the same as to the nontenured position of the teacher regardless of the fact that in some of those states the boards were obligated by state law to state their reasons for nonrenewal. The first is based upon a proper review of the time sequence of the "wrongs" involved, and the second is based upon the theory that in states where the law is similar to Act 74, the teacher is not stigmatized *by the board* but, rather, stigmatizes herself or himself by choosing to utilize alternatives which all will bring to the public's

---

4. Strong predilections, such as obtain here, by the district judge in favor of legislation protecting the teacher in such situations and, indeed, in reasonable tenure legislation must be disregarded. Both principles of federalism *and* separation of powers require this result. Justice in a democratic society is not, or should not be, the exclusive province of the courts. A just society requires just legislation. It is, or should be, the prerogative of the Arkansas legislature in the first instance to make the societal policy decision concerning teacher tenure.

attention the stated reasons for the board's decision not to renew.

■ In analyzing the time sequence of the events, it is interesting to note that, before a teacher invokes the provisions of the state's law giving him the right to learn of the reasons his contract was not renewed, he has not been stigmatized or deprived of his interest in liberty. All of the factors bearing upon the reason for the nonrenewal of his contract have occurred at a *prior* time. Now, suddenly, during the process of exercising his rights under the state statute, the teacher learns of an unflattering or stigmatizing "reason", whether justified by the facts or not, and further realizes that if this information gains public currency, he may have difficulty obtaining further employment as a teacher. The "wrong" done the teacher consists in the disclosures at the hearing—long after the reason for nonrenewal (whether valid or meritless) has materialized; and the public disclosures are the result of the teacher's decision to proceed to exercise his rights in a certain manner.

No adequate and comprehensive rationale has yet been enunciated by the Supreme Court in this type of employee dismissal case. This Court is satisfied that it should follow the *Buhr* decision, *supra*, and it is further satisfied that neither the differing facts and circumstances nor the minor differences in the state statutes involved would permit or require a different result here.

In the North Dakota case, Ms. Buhr was told at the *closed* meeting requested by her that the reason the board contemplated not renewing her contract was that "she was the cause of certain emotional and nervous stress and tension on the part of some of the students." Ms. Buhr argued that nonrenewal for such reasons deprived her of an interest in liberty by foreclosing future employment opportunities. Judge Webster, on behalf of the court, states:

"We cannot accept this argument under the factual circumstances of this particular case. Clearly, nonrenewal standing alone does not constitute the deprivation of an interest in liberty. [Cases cited.] On the other hand, where reasons for nonrenewal are announced publicly or are incorporated into a record made available to prospective employers, such reasons may indeed affect the dischargee's chances of securing another job. [Cases cited.] In the instant case, the reasons for nonrenewal were never publicized. Ms. Buhr was confidentially informed of the reasons only upon her request and then only at a closed meeting of the school board. The confidential nature of these charges was respected even during the trial court proceedings, and we note that Judge Benson made no explicit reference thereto in his summary judgment order and memorandum. *See* 364 F.Supp. [1225] at 1228 n. 1. We fail to discover any suggestion in the undisputed facts contained in the record that the defendants prejudiced Ms. Buhr's ability to secure another teaching position."

Here, there was a public hearing, but the plaintiff had already obtained from the board, privately and in writing, the reasons for the nonrenewal of his contract. Being unsatisfied, he then requested a public hearing which the board, under Act 74, was required to provide him. He actively sought a *public* airing of the entire matter. He urged that the meeting be held in a larger hall to accommodate the spectators. It even appears that the proceedings were broadcast by the local radio station. If the facts and circumstances developed at the hearing stigmatized him, then that was the result of his decision to request a public hearing. One should not be permitted to create federal jurisdiction under Section 1983 as a result of one's demand for a public airing of the circumstances surrounding the board's decision not to renew a contract.[5] As stated by Judge Webster,

5. On the basis of this analysis, it could, of course, be argued that a contrary result should follow in the situation where a teacher requests a private hearing but is nevertheless required

to go through a public hearing because of the board's insistence upon following that procedure, as permitted under Act 74.

*supra,* there is nothing in this record to suggest "that the defendants prejudiced" Mr. Williams' ability to secure another teaching or coaching position. On the contrary, if such prejudice was created by the public hearing, it was as a result of Mr. Williams' own decision to require such a public hearing.

▮ Since, properly analyzed, plaintiff had no property or liberty rights at stake, he was not entitled to that procedural due process provided by the United States Constitution. And it also follows, according to *Buhr,* that he had no substantive due process rights in the premises. Nevertheless, it is clear from the record of the school board hearing and the evidence produced at the trial of this cause that, even if the plaintiff had such substantive due process rights here, they were not violated since the decision of the board was in no way arbitrary or capricious. The board acted rationally upon the evidence that was before it which, of course, is not to say that that decision was either right or wrong. It was clearly a permissible decision well within the board's discretion.

▮ Having decided that the plaintiff was not entitled to either substantive or procedural due process under the circumstances of this case, the Court will nevertheless briefly address the question: was the plaintiff actually afforded such due process?

It is clear that the defendants complied with the specific requirements of Act 74 of 1970.[6] In fact, they extended to the plaintiff procedural advantages *not* specifically called for by Act 74. For instance, plaintiff, through his attorneys, asked for a "bill of particulars" with respect to the three reasons given for nonrenewal. In response, the defendants provided the plaintiff with a statement of twelve "factors" considered by the board in connection with its decision. Due process may have required such specification; Act 74 did not by specific language. In addition, the names of possible witnesses were provided, together with the opportunity to inspect certain school records. Fairly wide latitude was given to plaintiff's attorneys in the examination and cross-examination of witnesses.

The plaintiff asserts that due process requires an impartial tribunal and specifically complains that the record reflects that certain members of the school board were not impartial.[7] The Court has not found in the record any objection to the proceeding based on this ground prior to the hearing. In any event, Act 74 grants a "hearing before the school board"—nobody else.

Act 74 does not, by its specific language, *require* all of the elements of constitutional

**6.** It is not surprising to note that Act 74 has become, in essence, the "property of" the federal courts. This is not surprising since the practice has been to file all teacher dismissal and nonrenewal cases in federal court. As a consequence, it is unlikely that the Arkansas Supreme Court will be given an opportunity to interpret that act and to give content to such terms as "hearing" referred to therein.

**7.** The theory that the hearing officer should be impartial stems from the idea and hope that the hearing will result in a fair and just determination, one that is not arbitrary or capricious— thus illustrating the usual nexus between substantive and procedural due process. But, where nothing dictates that the hearing officer reach a just, fair or nonarbitrary result, then there is no constitutional need for an impartial hearing tribunal or other procedural process. *See Gould, supra.* One might ask then:

of what value is Act 74 if it only confers limited procedural rights? Although it does not confer tenure, Act 74 in fact tends to discourage arbitrary and capricious action. School board members are elected. They know that, although they have the power to act arbitrarily, their actions and decisions may be disclosed to the voting public. So even a board that is inclined to act unfairly will hesitate to do so. And, assuming a conscientious, good faith board, it is obviously of benefit to a teacher, whose contract is not being renewed for an invalid reason, to have the opportunity to bring out all of the facts at a "meeting" or "hearing". So it is specious to argue that Act 74 could have no purpose unless it were intended to vindicate a substantive right, and, ergo, ipse dixit—Act 74 requires "good cause" as a basis for nonrenewal and, thereby, the substantive right to continued employment—tenure—is created.

procedural due process. On the other hand, except in situations that might disqualify the board as a fair hearing tribunal, the act does not *prevent* a fully adequate due process hearing.

Was the plaintiff accorded procedural due process by the defendants? There is, of course, a flexible standard of procedural due process, depending upon the context.[8] In the school "hearing" situation concerning the nonrenewal of a teacher's contract, much less is obviously required than in a criminal proceeding in court. In this limited context it is the Court's conclusion that the procedures actually followed and permitted by the defendants in this case afforded the plaintiff the procedural due process required by the Constitution.

As far as substantive due process is concerned, the Court has already noted that plaintiff's exercise of his First Amendment rights was not the basis for the board's decision. The plaintiff was obviously a very successful coach. He apparently worked effectively and well in the school situation for years. He commanded a sizeable and dedicated following of students, teachers and school patrons. However, when his expectations and hopes were frustrated by the appointment of Mr. Mayo, he became bitter and resentful. (Coach Wright's appointment somewhat earlier may in fact have ended plaintiff's "happy years" at Blytheville.) There was substantial evidence from which the board could find that he was "insubordinate". That charge was not "pretextuous" as contended by Mr. Williams. When he had difficulty or ran counter to the directions of those in authority over him, he often resorted to actions, or threats, aimed at "going public" or bypassing his superiors. Thus the basis for certain of his First Amendment claims. Though these threats and actions may have further irritated the board, they were not the basis of its decision not to renew plaintiff's contract. The impression one gets is that the board would have liked very much to keep Coach Williams, but could not at the cost of constant turmoil based upon his unwillingness to accept the authority of those above him or to conform his conduct to reasonable standards. The further impression one gets, based upon all the evidence and the reasonable inferences arising therefrom, is that Coach Williams, after Mayo's appointment, finally decided that he could not live with the situation and that he would in fact, sooner or later, depart the scene, one way or another. Psychologically, he was "leaving". However, he wanted vindication and public awareness of the "wrongs" which he felt had been heaped upon him. Thus his persistent course of conduct which confronted the board with this situation: someone has to go; we must determine who is responsible.

It is a sad story. But it is the type of problem that confronts school boards, unfortunately, on not infrequent occasions— the type which totally involves the entire school community. This particular school community has finally resolved the problem. It cannot be said that it did so in an unfair or arbitrary manner. The matter should therefore remain at rest.

Plaintiff's complaint will be dismissed, costs to be awarded defendants. A judgment will be entered accordingly this date.

8. The varying standards permitted in the student suspension and expulsion cases, the prison discipline cases, and in the parole and probation revocation cases illustrate the point. In each of these situations the complainant also has a clear substantive interest which the procedural safeguards are designed to protect. Particularly important here is the case of *Brouillette v. Board of Directors*, 519 F.2d 126 (8th Cir. 1975).