Elizabeth **FUJIWARA** and Ira Vanterpool, Plaintiffs,

v.

Charles G. **CLARK**, Individually and in his capacity as Superintendent, Department of Education, State of Hawaii, Thomas Yamashita, Individually and in his capacity as Director, Management Audit and Civil Rights Branch, Department of Education, State of Hawaii, Rev. Darrow L. K. Aiona, Hubert P. Minn, George S. Adachi, Dr. Richard Ando, Marion Saunders, Ruth Tabrah, Howard I. Takenaka, Hiroshi Yamashita and Noburo Yonamine, in their capacities as Members, Board of Education, State of Hawaii, Defendants.

Civ. No. 78–0062.

United States District Court, D. Hawaii.

Aug. 10, 1979.

See also, D.C., 477 F.Supp. 794.

Paul Alston, Honolulu, Hawaii, for Fujiwara.

American Civil Liberties Union of Hawaii, Honolulu, Hawaii, Mary Blaine Durant, Honolulu, Hawaii, for Vanterpool.

Lawrence D. Kumabe, Robin K. Campaniano, Deputy Attys. Gen., Honolulu, Hawaii, for defendants.

## ORDER GRANTING DEFENDANTS PARTIAL SUMMARY JUDGMENT

SAMUEL P. KING, Chief Judge.

On February 25, 1977 and June 3, 1977, respectively, plaintiff Vanterpool, an experienced worker in civil rights matters, and plaintiff Fujiwara, the former executive director of the local ACLU affiliate, were hired by the Department of Education [hereinafter "DOE"] as certified non-probationary temporary employees in the Management Audit and Civil Rights [hereinafter "MACR"] Branch. Plaintiff Vanterpool, hired as a Staff Specialist II (equal education opportunities coordinator), reported to defendant Yamashita, Director of the MACR Branch; plaintiff Fujiwara, who was classified as a Staff Specialist I (equal education opportunities specialist), reported to plaintiff Vanterpool. Plaintiffs were hired to provide temporary technical assistance for the remainder of the fiscal year 1976–77 in the programing and monitoring of the DOE's compliance with the several applicable federal laws and regulations in the civil rights area, especially Title IX of the Education Amendments of 1972.

Unbeknownst to defendants, plaintiffs scheduled several press conferences to publicize a Pacific Regional Conference on Civil Rights Compliance in Schools that was to be sponsored by the DOE. Plaintiffs informed the news media that the DOE was not in full compliance with civil rights legislation requiring equal opportunities for students, equal employment opportunities, and non-discrimination based on race, sex or handicap. Despite defendant Clark's subsequent

warning against holding any news conferences without first advising defendant Yamashita, plaintiffs met the press again without defendants' authorization on December 26, 1977 to discuss the civil rights conference. During this press conference, plaintiff Vanterpool predicted that the state would lose $30.5 million in U. S. education funds by failing to comply with equal opportunity laws. Defendant Clark reacted strongly to plaintiffs' publicized opinions and held a news conference to refute plaintiffs' contentions.

On January 30, 1978, defendant Yamashita submitted by letter a Recommendation for Discharge of Mr. Vanterpool and a Recommendation for Discharge of Ms. Fujiwara to defendant Clark, the Superintendent of the DOE, pursuant to Regulation # 5110 of the School Code and Article V, Rights of the Employer of Unit 6 Educational Officers Collective Bargaining Agreement. Each letter set forth "facts leading to my recommendation for discharge" which included, *inter alia,* that plaintiffs scheduled a news media conference concerning a civil rights conference without advising defendant Yamashita or defendant Clark that they would be discussing matters of statewide concern to the DOE; that plaintiffs subsequently called two other news conferences in which they incorrectly maintained that the DOE would lose $30.5 million in federal funds if equal education opportunity laws were not complied with by July 1978 and that the DOE was not in full compliance with Title IX requirements; and that plaintiffs continued to hold news conferences concerning the civil rights compliance program despite several warnings by defendant Clark against making public statements about the DOE without advising defendants Yamashita or Clark.

Defendant Yamashita related additional reasons for terminating plaintiff Vanterpool: that plaintiff Vanterpool had distributed and incorrectly referred to statistical summaries which erroneously showed that the DOE was not in compliance with Title IX; that he failed to submit to defendant Yamashita an assigned report; that he drafted an unacceptable version of Title IX

guidelines; that he performed certain departmental actions, such as hiring an employee and scheduling speakers for the Pacific Regional Conference on Civil Rights, without prior approval from defendant Yamashita in violation of specific instructions from defendant Clark; that he hired an employee without following established department procedures; and that he promised an honorarium to one speaker at the Pacific Regional Conference on Civil Rights in violation of the departmental regulations that govern such payments.

Defendant Yamashita also recited additional reasons to support his recommendation to terminate plaintiff Fujiwara: that she continually used the copy facilities of the DOE law library to copy legal documents for her personal use which were unrelated to her work despite defendant Yamashita's warning against such actions; and that she ignored defendant Yamashita's request that she apprise him of her weekly activities, particularly those of statewide concern.

By letter dated January 31, 1978, defendant Clark notified each plaintiff of his receipt of defendant Yamashita's recommendations and suspended them from employment without pay, effective January 31, 1978, pending final disposition of the recommendation for discharge. Defendant Clark subsequently terminated the employment of plaintiffs, effective February 8, 1978.

Plaintiffs' terminations and the incidents leading up to the terminations resulted in the complaint filed in this court on February 24, 1978. In their claim for injunctive relief and damages pursuant to 42 U.S.C. § 1983, plaintiffs allege that they were discharged for exercising rights of free speech guaranteed to them by the First and Fourteenth Amendments, in violation of substantive and procedural rights of due process guaranteed to them by the Fourteenth Amendment. Plaintiffs also allege that defendants' wanton and reckless conduct was in complete disregard for their constitutional rights and caused them irreparable injury. Attached to the complaint was plain-

tiffs' demand for a jury trial of the legal issues pursuant to Rule 38(b) of the Federal Rules of Civil Procedure. A temporary restraining order was denied on February 24, but a preliminary injunction was granted on March 8, 1978. As a result, plaintiffs were reinstated in their respective positions but immediately placed on administrative leave.

On March 8, 1978 plaintiffs' Motion for Permanent Injunction was set for hearing by this Court on March 21, 1978. After hearing extensive oral arguments on March 20, April 6 and April 18, this Court issued a "Final Order Granting Permanent Injunction" on June 29, 1978 that restored plaintiffs to their former positions with all accrued employee benefits and enjoined defendants from disciplining, demoting or dismissing plaintiffs primarily because of their statements to the press. Under order of the Court, the injunction was immediately executed. The injunction embodied a memorandum of decision issued on June 8 wherein this Court specifically reserved the issues of damages, attorneys' fees and costs for further determination. The Court also stated that defendants' other reasons for terminating plaintiffs which were set forth in defendant Yamashita's letters of January 30, 1978 had not been brought to plaintiffs' attention in a disciplinary context until they received the letters. The injunction was premised on a finding that plaintiffs had been fired in substantial part for exercising their right to speak on issues of public importance in violation of protection accorded them by the First Amendment.

Subsequent to the issuance of the injunctive order plaintiffs were reinstated with back pay and all accrued benefits.

On February 15, 1979, plaintiffs filed a Motion for Partial Summary Judgment on the Issue of Liability for Damages of defendants Clark and Yamashita. In this motion, plaintiffs contend that because this Court has already determined that defendants wrongfully discharged plaintiffs in

substantial part because of their exercise of protected First Amendment rights, they can only evade individual liability for damages by proving that they are entitled to qualified immunity. Plaintiffs further allege that no evidence has been or could be produced to sustain a finding of qualified immunity for defendants.

On March 2, 1979, defendants filed an Amended Motion to Dismiss.[1] Defendants have moved to dismiss all pending claims of the plaintiffs on the grounds that defendants, as state officials, are entitled to qualified immunity from individual liability for damages under § 1983; that plaintiffs, in proceeding to trial on the permanent injunction motion without first pursuing their earlier demand for a jury trial on all legal claims and requesting separate trials on the legal and equitable claims of this action under Rule 42(b) of the Federal Rules of Civil Procedure, waived all pending legal claims which included the claim for damages; and that the injunctive order, issued after a hearing on the merits, provided full and final relief to the plaintiffs which extinguished their cause of action.

In their respective motions, the parties have asserted that the facts are undisputed and the movant is entitled to a judgment as a matter of law. A hearing on the parties' motions was held on March 14, 1979.

In their Verified Complaint of February 24, 1978, plaintiffs request an award of special, general and punitive damages. They claim compensation for the loss of income, humiliation, emotional and mental distress, anxiety and other injuries caused by defendants' actions in terminating plaintiffs without cause in violation of their First Amendment rights and in failing to provide plaintiffs with an opportunity to contest their discharge. In their request for punitive damages, plaintiffs further allege that defendants exhibited wanton misconduct and a reckless disregard for the plaintiffs' civil rights.

---

1. This motion superseded a motion to dismiss that had been filed by defendants on November 16, 1978. Within the amended motion to dismiss defendants alternatively requested that this Court grant summary judgment in their favor.

"In actions under 42 U.S.C. § 1983, compensatory and punitive damages are recoverable for deprivations of First Amendment rights by persons acting under color of state law." *Butler v. United States*, 365 F.Supp. 1035, 1040 (D.Hawaii 1973) (footnote omitted). In addition to recovery for a party's out-of-pocket pecuniary loss, compensatory damages may be recovered for mental and emotional distress without proof of actual damage. *Donovan v. Reinbold*, 433 F.2d 738, 743 (9th Cir. 1970). Thus, plaintiffs' claim for damages is an appropriate request for relief under 42 U.S.C. § 1983.

Defendants contend that the injunctive order provided final relief to the plaintiffs which extinguished their cause of action.[2] This contention is based on four arguments: (1) that the Court's injunctive order provided sufficient relief to plaintiffs which renders their claim for further relief for damages unnecessary; (2) that the injunctive order, issued after a hearing on the merits, settled the rights of the parties; (3) that plaintiffs waived their claim for damages by proceeding to trial without requesting separate trials on their claims for injunctive relief and damages; and (4) that plaintiffs waived their claim for damages by proceeding to trial on the merits of their § 1983 action without specifically reserving their right to a jury trial on the legal issue of damages.

Defendants first argue that the injunctive order requiring plaintiffs' reinstatement for the remainder of their temporary positions is a more severe remedy than damages and that, because plaintiffs have already obtained the more desirable remedy, the Court may not provide them further relief in the form of damages. Defendants rely on *Decker v. North Idaho College*, 552 F.2d 872 (9th Cir. 1977) to support their contention. *Decker*, however, is inapposite in this context.[3] The instant case is governed by *Wagle v. Murray*, 546 F.2d 1329 (9th Cir. 1976), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978). Under *Wagle*, reinstatement and damages may be awarded in a § 1983 action which is premised on the violation of an individual's First Amendment right to free speech.[4] Therefore, this Court will consider plaintiffs' claim for damages.

Defendants next argue that a permanent injunction, which is issued only after a full hearing on the merits, was a final judgment that settled the rights of the parties after a determination of all the issues raised in this action and precludes any further litigation of plaintiffs' claim for injunctive relief and damages under § 1983. To support their contention, defendants rely on *Norman's on the Waterfront, Inc. v. Wheatley*, 317 F.Supp. 247 (D.St.Thomas and St. John, V.I. 1970), *aff'd*, 444 F.2d 1011 (3rd Cir. 1971).[5] Upon awarding a perma-

---

2. Defendants' Memorandum in Support of Motion to Dismiss and in Opposition to Motion for Summary Judgment at 4 (filed March 13, 1979).

3. In *Decker*, a discharged college instructor brought an action against the college administrators in which he claimed that his dismissal without a hearing violated his Fourteenth Amendment due process rights. The Ninth Circuit found that the equitable remedy of reinstatement was not appropriate in this context. The court noted that "the *'extraordinary equitable remedy'* of reinstatement is commonly imposed in only two factual situations: (1) those involving racial discrimination, and (2) those where the dismissal was in reprisal for the exercise of First Amendment rights." 552 F.2d at 874; *Burton v. Cascade School District Union High School, No. 5*, 512 F.2d 850 (9th Cir. 1975). Neither of these situations was present in *Decker*.

4. In *Wagle*, a high school teacher alleged that his dismissal by the superintendent and directors of the school district violated his protected First Amendment right of free speech. Pursuant to § 1983, Murray sought reinstatement and damages. In addition to allowing the jury award of damages, the Ninth Circuit "recognized that reinstatement is usually granted in cases involving discharge 'aimed at punishing the exercise of free speech.' " 546 F.2d at 1336 (quoting *Burton v. Cascade School District Union High School, No. 5*, 512 F.2d 850, 853 & n.3 (9th Cir. 1975) (footnote omitted)). The undulant history of *Wagle* is fully explained at notes 37–40 *infra* & accompanying text.

5. *Norman's* involved an action for declaratory relief and injunction against the enforcement of Virgin Islands Alcoholic Beverages Fair Trade Law.

nent injunction to plaintiffs, the district court in *Norman's* reasoned, "The parties have fully briefed and argued the legal issues dispositive of the case with the understanding that the court would enter a final judgment . . . .. Therefore, there is no reason to delay a final decision in this case." 317 F.Supp. at 254.

The present case is clearly distinguished from *Norman's*. In *Norman's* the parties argued all issues which were pertinent to the action. In the instant case, the parties presented to the Court only those issues which pertained to plaintiffs' claim for injunctive relief. Because plaintiffs' claim for damages involved similar liability issues, this Court considered those issues concerning defendants' liability for damages during the hearing on plaintiffs' motion for a permanent injunction. Nevertheless, the parties failed to argue defendant Clark's and defendant Yamashita's defense of qualified immunity for state officials, an essential issue in the determination of defendants' individual liability for damages. Therefore, the Court's reasoning in *Norman's* fails to support defendants' contention that the injunctive order which was issued after a hearing on the merits settled all issues in plaintiffs' § 1983 action.

■ Defendants also argue that plaintiffs may not pursue their claim for damages because they failed to request separate trials on their claims for injunctive relief and damages under Rule 42(b) of the Federal Rules of Civil Procedure.[6] Without separate trials on the merits under Rule 42(b), plaintiffs cannot proceed with their claim for damages based upon plaintiffs' final judgment under Rule 54(b).[7] In *Atkins, Kroll (Guam), Ltd. v. Cabrera*, 277 F.2d 922, 924 (9th Cir. 1960), the court stated, "It follows that under Rule 54(b) the judgment before us is not final unless made so by the fact that it resulted from a separate trial of that claim offered by the court pursuant to Rule 42(b)."[8] Defendants therefore contend that, because the injunctive order is not a final judgment pursuant to Rule 54(b), it is a final adjudication of all of the claims, rights and liabilities of the parties.

In order for a judgment to be certifiable under Rule 54(b), it "must possess the requisite degree of finality, and must dispose of at least a single substantive claim." *Acha v. Beame*, 570 F.2d 57, 62 (2d Cir. 1978).[9] A judgment is certifiable as final under Rule 54(b) only if it satisfies the appealability requirements of 28 U.S.C. § 1291.[10] A judg-

---

**6.** Rule 42(b) provides in pertinent part:
The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, . . or of any separate issue or of any number of claims, . . . always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

**7.** Rule 54(b) provides in pertinent part:
When more than one claim for relief is presented in an action, whether as a claim, counterclaim . . . or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

**8.** In *Atkins*, plaintiff, the winner of a raffle, brought an action to recover damages when he was unable to obtain delivery of a new car which had been offered as a prize. Three claims against various defendants were stated in the complaint. The Ninth Circuit affirmed

the trial court's order for a separate trial of the third claim which was directed against Atkins, Kroll since it was desirable to initially determine the liability of Atkins, Kroll. *See also Reeves v. Beardall*, 316 U.S. 283, 62 S.Ct. 1085, 86 L.Ed. 1478 (1942).

**9.** In *Acha v. Beame*, plaintiffs filed a § 1983 class action against New York City, its mayor and police chief to enjoin the layoff of female police officers scheduled for June 30, 1975. The plaintiffs appealed the district court order which denied injunctive relief and vacated partial summary judgment which had previously been granted to certain officers. The Second Circuit held that the district court's denial of plaintiffs' motion for injunctive relief in its order granting partial summary judgment to defendants was not a final judgment on plaintiffs' entire claim under Rule 54(b) because the district court had reserved consideration of further relief.

**10.** 28 U.S.C. § 1291 provides that "[t]he courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . .."

ment that is appealable under § 1291 is one "which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Acha v. Beame*, 570 F.2d at 62 (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 81 L.Ed. 911 (1945)). "Where a judgment is not 'final' within the terms of 28 U.S.C. § 1291, and hence not certifiable under Rule 54(b), it has no *res judicata* effect." 570 F.2d at 63.[11] Furthermore, a final judgment under Rule 54(b) is limited to "multiple claim actions in which 'one or more but less than all' of the multiple claims have been finally decided and are found otherwise to be ready for appeal." *U. S. v. Burnett*, 262

F.2d 55, 59 (9th Cir. 1958) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435, 76 S.Ct. 895, 100 L.Ed. 1297 (1956)).[12] The partial adjudication of a single claim does not satisfy the requirements of Rule 54(b) and therefore has no res judicata effect regardless of whether there is a Rule 54(b) certificate.[13] Thus, the determination of whether this order is certifiable as a final judgment under 54(b) that is res judicata as between the parties turns on whether plaintiffs' action pursuant to § 1983 involves a single or multiple claims for relief.

The law of the Ninth Circuit[14] is that "The term 'claim' within the meaning of

11. The *Acha* Court noted that, although it was bound to apply its understanding of present law,

> there may be sound reasons for modifying our concept of finality in cases of this type, or in amending Rule 54(b) to permit certification when the majority of relief has been granted. And there is indeed precedent for taking a more liberal view of finality in limited circumstances analogous to those in the instant case. See, for example, our opinions in *American Renaissance Lines, Inc. v. Saxis Steamship Co.*, 502 F.2d 674 (2d Cir. 1974); *Zdanok v. Glidden Co.*, 327 F.2d 944, 955 (2d Cir. 1964); and *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 87–90 (2d Cir. 1961). See also *Bee Machine Co. v. Freeman*, 131 F.2d 190, 192–93 (1st Cir. 1942), aff'd 319 U.S. 448, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943); *Sherman v. Jacobson*, 247 F.Supp. 261, 267–72 (S.D.N.Y.1965), and *Restatement (Second) of Judgments*, § 41, comment g (Tent.Draft No. 1, 1973).

570 F.2d at 64 n.8.

> Nevertheless, the situations upon which these cases and the Restatement of Judgments premise their more liberal view of finality are distinguishable from the present situation in that they involve the "decision of a given issue in an action [which is] carried over to a second action in which it is again being litigated." *Restatement (Second) of the Law of Judgments*, § 41, comment g at 6. (Tentative Draft No. 1, 1973). In the present case, plaintiffs claimed injunctive relief and damages under § 1983. Section 1983 involves a *single civil action* wherein plaintiffs may request and obtain both legal and equitable remedies. *Harkless v. Sweeney Independent School District*, 278 F.Supp. 632, 636 (S.D.Texas 1968), *cert. denied*, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971).

12. In *Burnett*, plaintiff sought damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.* The district court determined de-

fendant's liability for damages that were suffered by the plaintiff up to the date of the trial, but reserved its determination of the issue of future damages for a later hearing. On appeal, the Ninth Circuit held that, despite the language of certification required by Rule 54(b) that designates a judgment as final, "the character of a judicial act is to be determined 'by its own essential purport and effect not by the statements of the pleaders about it.' " 262 F.2d at 59 (quoting *Simmons Co. v. Grier Bros. Co.*, 258 U.S. 82, 89, 42 S.Ct. 196, 66 L.Ed. 475 (1922)). In reserving the issue of future damages, the essential purport and effect of the district court's order therein that specifically reserved the issue of future damages was to dispose of only a portion of the issues presented by plaintiff's single claim for damages. Similarly, in the present case, this Court determined the issues pertinent to plaintiffs' motion for injunctive relief but specifically reserved the issue of damages for further determination.

13. *Burnett*, 262 F.2d at 59; *Acha*, 570 F.2d at 62. "A proper certificate consists in the district court's making (1) 'an express determination that there is no just reason for delay' *and* (2) 'an express direction for the entry of judgment'; both the determination and the direction are needed for an effective certificate." 6 *Moore's Federal Practice* ¶ 54.41[1], at 711 (2d ed. 1976) (footnotes omitted). The injunctive order of June 29, 1979 included this required language.

14. A second school of thought espouses "that separate occurrences or transactions form the basis of separate units of judicial action." *Repass v. Vreeland*, 357 F.2d 801, 805 & n.4 (3d Cir. 1966). Under this test, "claims having the same factual matrix cannot be separate." 9 *Moore's Federal Practice* ¶ 110.09, at 128 (2d ed. 1975); see *Town of Clarksville v. United States*, 198 F.2d 238 (4th Cir. 1952), *cert. de-*

[Rule 54(b)] means a cause of action." *School District No. 5 v. Lundgren*, 259 F.2d 101, 104 (9th Cir. 1958).[15] "[A] complaint asserting only one legal right, even if seeking multiple remedies for the alleged violation of the right, states a single claim for relief." *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 743 n.4, 96 S.Ct. 1202, 1206 n.4, 47 L.Ed.2d 435 (1976). In the present case, plaintiffs seek the multiple remedies of injunctive relief and damages for the alleged violation of plaintiffs' protected First Amendment right to speak freely on issues of public concern. Thus, I conclude that plaintiffs' § 1983 action constitutes a "single claim for relief."

This Court's injunctive order issued on June 29, 1978, determined all of the issues relevant to plaintiffs' motion for injunctive relief. Coincidentally, most of these issues necessarily pertain to the adjudication of plaintiffs' prayer for damages. Nevertheless, this Court's reservation of plaintiffs' request for damages indicates that only a portion of plaintiffs' single claim for relief was resolved.[16] Therefore, because the injunctive order failed to dispose of a single substantive claim and lacks the requisite finality, it is not certifiable under Rule 54(b).[17] Furthermore, the injunctive order of June 29, 1978 is also not a final judgment that adjudicated all of the parties' rights and liabilities and thereby extinguished plaintiffs' cause of action.[18]

Defendants finally argue that plaintiffs waived their claim for legal relief of damages by proceeding to trial on their claim for equitable relief without reserving their right to a jury trial. Rule 39(a) of the Federal Rules of Civil Procedure provides that once a

> trial by jury has been demanded as provided in Rule 38 . . . [t]he trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court or entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

---

nied, 344 U.S. 927, 73 S.Ct. 495, 97 L.Ed. 714 (1953).

**15.** The *Lundgren* Court concluded that the sole basis of plaintiff's action against the school district to recover an unpaid balance under a school construction contract was the school district's failure to discharge various contractual obligations. This constituted a "single claim for relief." Therefore, the court held that the district court's confirmation of an arbitration award that disposed of several legal issues of plaintiff's action was not final under 54(b) because the arbitrator had specifically reserved for court determination various items of damage that Lundgren sought to recover. Thus the test of multiple claims under *Lundgren* is similar to that espoused in *Rieser v. Baltimore and Ohio Railroad Co.*, 224 F.2d 198 (2d Cir. 1955), cert. denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956). Therein, the Second Circuit stated that the test was "whether the underlying factual bases for recovery state a number of different claims which could have been separately enforced." 224 F.2d at 199.

**16.** Plaintiffs correctly note, however, that "[t]he decision of the injunctive claim finally determined all issues common both to it and the claim for damages." *Perryton Wholesale, Inc. v. Pioneer Distributing Company of Kansas, Inc.*, 353 F.2d 618, 623 (10th Cir. 1965),

cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966) (footnote omitted); *see* Plaintiffs' Memorandum in Opposition to Defendants' Amended Motion to Dismiss at 10 (filed March 7, 1979).

**17.** [W]hen res judicata is in question a judgment will ordinarily be considered final in respect to a claim . . . if it is not tentative, provisional, or contingent and represents the completion of all steps in the adjudication of the claim by the court, short of any steps by way of execution or enforcement that may be consequent upon the particular kind of adjudication. Finality will be lacking if an issue of law or fact essential to the adjudication of the claim has been reserved for future determination, or if the court has decided that the plaintiff should have relief against the defendant on the claim but the amount of the damages, or the form or scope of other relief, remains to be determined.

*Restatement (Second) of the Law of Judgments*, § 41, comment b at 3. (Tent.Draft No. 1, 1973).

**18.** Thus, the so-called permanent injunction is in effect an interlocutory order that is appealable under 28 U.S.C. § 1292.

After plaintiffs complied with Rule 38(b) [19] in filing a timely demand for a jury trial on February 24, 1978, there was no such written stipulation or court order that a right to jury trial did not exist. Therefore, defendants argue that plaintiffs, by proceeding to trial on their claim for injunctive relief without specifically reserving their right to a jury trial, waived their entire claim for damages. To support their argument, defendants rely on *Beacon Theatres v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) [20] and *Dairy Queen v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).[21] The legal significance of these cases is that

where determination of the equitable issues would be conclusive as to the legal issues, the legal issues must be tried first in order to prevent abrogation of the right to a jury trial. Thus, in the absence of a waiver, the proper procedure would be for the district court . . . to try the legal issues before a jury, and then hold the hearing itself on the permanent injunction.

*Southland Reship, Inc. v. Flegel*, 534 F.2d 639, 644 (5th Cir. 1976), *rehearing and rehearing en banc denied*, September 17, 1976.[22]

---

**19.** Rule 38(b) states in part, "Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. . . ."

**20.** In *Beacon Theatres*, the plaintiff sought declaratory relief and an injunction prohibiting defendant from suing for treble damages under the antitrust laws pending the outcome of the declaratory judgment litigation. Defendant cross-claimed the issues which would have been raised in the antitrust suit and demanded a jury trial. The district court viewed the complaint for declaratory relief and an injunction as equitable and decided that the court should try the common antitrust claims. The Supreme Court reversed, holding that because the defendant would have been entitled to a jury trial in a treble damage suit against the plaintiff, he could not be deprived of that right merely because plaintiff sued for equitable relief first.

**21.** In *Dairy Queen, Inc.*, Dairy Queen sued a trademark licensee for breach of contract, seeking an injunction against the use of the trademark and a judgment of money damages. Defendants denied the breach of contract, alleged that plaintiffs violated the antitrust laws and demanded a jury trial. The district court denied a jury trial on the alternative grounds that either the action was purely equitable, or that the legal issues were merely incidental to the equitable issues. The Supreme Court held that because the complaint requested money damages it was unquestionably a legal claim requiring a jury trial.

**22.** In *Flegel*, Southland Reship, a wholesale distributor of books, magazines, newspapers and periodicals, sought injunctive relief and damages against a competitor for violation of antitrust laws and tortious interference with plaintiff's contractual relations. Plaintiff filed a timely motion pursuant to Rule 38(b) in which

he demanded a jury trial on " 'all the issues so triable.' " 534 F.2d at 643 (quoting *Fed.R. Civ.P.* 38(c)). After a full hearing on the merits of plaintiff's claim for injunctive relief, the district court denied plaintiff's motion for a permanent injunction. On appeal, plaintiff argued that because he did not formally stipulate to a trial without a jury under Rule 39(a), he is entitled to one on all legal issues, including defendant's liability for damages.

The Fifth Circuit held that the parties had waived their right to a jury trial on liability while retaining the right to a jury trial on damages. The Fifth Circuit concluded that plaintiff's actions constituted a waiver of his demand for a jury trial. These actions included plaintiff's failure to object to the district court's hearing on the merits of the injunction claim prior to a jury determination of defendant's liability for damages in the time between the filing of the consolidation action and notice of the hearing date on April 18, 1975 and the commencement of the hearing on May 19, 1975, his failure to object at the outset of or during the hearing, and plaintiff's failure to object before submitting to the court findings of fact and conclusions of law pursuant to the order of the district court. The court also noted that defendants had waived the right to a jury trial on the liability issues by reminding the judge at the outset of the hearing of the request for a jury trial on the issue of damages if that issue were ever reached. The court concluded by stating that " 'in a civil case a waiver [of right to jury after demand] is shown by mere acquiescence, when the party or his counsel is present and not objecting.' " 534 F.2d at 645 (quoting *Bass v. Hoagland*, 172 F.2d 205 (5th Cir. 1949), *cert. denied*, 338 U.S. 816, 70 S.Ct. 57, 94 L.Ed. 494 (1949). *See also Chapman v. Kleindienst*, 507 F.2d 1246 (7th Cir. 1974) (a party's failure to object normally constitutes a waiver of his right to jury trial but not in a pro se case where he may be unaware of his right to object to a hearing to the court).

In the case at bar, plaintiffs admit that they have waived their right to a jury trial on the litigated issues that are common to their claims for injunctive relief and damages.[23] Defendants' failure to object to a hearing on the injunction claim prior to a jury determination of defendants' liability for damages also constitutes a waiver of their right to a jury trial on the litigated issues.[24] On March 8, 1978, the hearing on the permanent injunction motion was set for March 20, 1978. From this time until the commencement of the hearing, the parties, who were represented by attorneys, failed to object to the form of the hearing. In March and April, during the hearings on the permanent injunction motion, they again failed to raise this issue. Without objection, the parties complied with this Court's request to submit an injunctive order for court approval. Therefore, I conclude that the parties have waived their right to a jury trial on all of the issues common to plaintiffs' claims for injunctive relief and damages. Nevertheless, because the issue of defendants' liability was only raised in the litigation of plaintiffs' motion for an injunctive order against defendants Clark, Yamashita and the members of the school board, the parties did not argue the question of the good faith immunity from individual liability for damages of defendants Clark and Yamashita. Therefore, under the rationale of *Beacon Theatres* and *Dairy Queen*, it was not necessary that the question of defendants' qualified immunity from damages be submitted to a jury before the Court had adjudicated plaintiffs' claim for injunctive relief because the determination of the equitable issues was not conclusive as to the issue of liability for damages. Thus, plaintiffs are not foreclosed from asserting their right to a jury trial on their legal claim for damages.[25] It is therefore necessary to consider defendants' remaining contention that they are entitled to qualified immunity from individual liability for damages as a matter of law.

The parties do not dispute that qualified immunity is available to defendants, as high officials of the DOE, as a defense to plaintiffs' claim that defendants are individually liable for § 1983 damages. In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court determined that school officials are entitled to qualified immunity to insure the continuance of the important functions of the school.[26] The Court concluded, however,

23. Plaintiffs' Memorandum in Opposition to Defendants' Amended Motion to Dismiss at 6 (filed March 7, 1979).

24. Once a timely demand for a jury trial has been filed, plaintiffs' right to a jury trial inures to defendants. A demand for jury trial may not be withdrawn without both parties' consent. *Yates v. Dann*, 223 F.2d 64 (3rd Cir. 1955).

25. Defendants argue that *Flegel* weakens plaintiffs' assertion that they are entitled to a jury trial on the remaining issues which pertain to their claim for damages. In *Flegel*, the court consolidated plaintiff's motions for preliminary and permanent injunctions under Rule 65(a)(2). Rule 65(a)(2) specifically provides:

> (2) *Consolidation of Hearing with Trial on Merits.* Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. . . . This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

In the present case, there was no consolidation under Rule 65(a)(2) which specifically reserves a party's right to jury trial. Defendants argue that plaintiffs, in proceeding to trial on their motion for a permanent injunction without specifically reserving their right to a jury trial, waived their entire claim for damages under § 1983 because a permanent injunction is a final judgment on the merits.

Defendants' argument is unpersuasive. It has already been determined that the injunctive order did not extinguish plaintiffs' claim for damages. *See* note 4 *supra* & accompanying text.

26. *Wood* granted qualified immunity from § 1983 damages to school board members who had expelled students for violating a school regulation that prohibited the use or possession of intoxicating beverages at school or school activities.

> [I]mmunity must be such that public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity.

420 U.S. at 321, 95 S.Ct. at 1000.

that qualified immunity would be unavailable if the official

> knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury
>
> . . . .

*Id.* at 322, 95 S.Ct. at 1001. To benefit from the defense of qualified immunity, defendants must establish by a preponderance of the evidence that they have satisfied the standards of *Wood*. *Skehan v. Board of Trustees of Bloomsburg State College*, 538 F.2d 53, 61–62 (3rd Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976).

Plaintiffs contend that, as a matter of law, defendants knew or reasonably should have known that their alleged conduct would violate plaintiffs' protected First Amendment rights. Plaintiffs therefore argue that they are entitled to partial summary judgment on the issue of defendants' qualified immunity because defendants will be unable to satisfy the objective good-faith requirement of the dual test of good faith established in *Wood*. Conversely, defendants contend that they are entitled to summary judgment on the issue of qualified immunity because they have shown that they satisfy both prongs of the *Wood* test.

■ In *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Supreme Court clarified the objective standard of *Wood*.[27]

> Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of their right and

if they knew or should have known that their conduct violated the constitutional norm.

434 U.S. at 562, 98 S.Ct. at 860. Therefore, to show that they are entitled to qualified immunity under the objective good-faith standard of *Wood*, defendants must show either that plaintiffs' First Amendment right to publicly criticize actions of their employer in their official capacities was not a clearly established legal principle at the time of their termination from employment, that defendants did not know and should not have known of this right, or that defendants did not know and should not have known that their conduct violated this constitutional right.

Plaintiffs argue that *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny established the well-known constitutional right that public employees are entitled to First Amendment protections. Defendants, on the other hand, contend that *Pickering* fails to establish a standard to determine whether a state employee's public statements are protected under the First Amendment because of the variety of factual situations in which these statements are made.

*Pickering* involved a school board's dismissal of a teacher for his public criticism of the board's allocation of school funds and the superintendent's and board's failure to inform the taxpayers in the school district of the true reasons for additional revenues that the Board had recently proposed. Although the Supreme Court in *Pickering* failed to establish a general standard to determine whether any public statements by state officials may be afforded First Amendment protection, it provided detailed guidelines for weighing and balancing the interests of the school official as a citizen to comment upon matters of public concern and those of the state in providing efficient

---

**27.** In *Procunier*, a state prisoner brought an action under § 1983 in which he alleged that prison officials had violated his constitutional rights under the First and Fourteenth Amendments by their negligent interference with his outgoing mail. The Supreme Court held, as a matter of law, that state prison officials were entitled to qualified immunity from liability for damages under § 1983 because there was no basis for rejecting the immunity defense under the objective good faith standard.

public services.[28] Upon examination of appellant's written statements, the Court concluded that the maintenance of discipline by immediate superiors and harmony among co-workers would not be adversely affected by plaintiff's criticism of the board's activities because they had not been specifically directed at such individuals; that the nature of appellant's employment relationship with the board and superintendent was not so personal and intimate that the employee's public criticism "would seriously undermine the effectiveness of the working relationship;"[29] that the proper functioning of the employment relationship did not demand personal loyalty and confidence; that the evidence failed to show that appellant deliberately or recklessly made false statements; and that appellant's claims would neither impede his performance as a teacher nor hinder the actual operation of the schools beyond their "tendency to anger the board."[30] Furthermore, the Court found

that, because the operation of the school system is of general public concern, those individuals involved in its operation have the right to publicly address the pertinent issues "without fear of retaliatory dismissal."[31]

Under *Pickering* and its progeny, plaintiffs' public criticism of the DOE's compliance with the various civil rights laws was clearly within the scope of First Amendment protection.[32] Compliance with those laws that provide equal opportunities to students and discourage discrimination in schools based on race, sex and national origin are significant matters of public concern. Plaintiffs, both knowledgeable civil rights workers, were familiar with the problems of the DOE's compliance program. Their jobs did not involve any intimate, personal working relationships which demanded personal loyalty and confidence. In their statements to the news media, they criticized only the policies of the DOE,

---

**28.** The *Pickering* Court stated:

[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. . . . Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed, to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged. However, in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration in the context of this case, we shall indicate some of the general guidelines along which an analysis of the controlling interests should run.

391 U.S. at 568–69, 88 S.Ct. at 1734–35.

**29.** *Id.* at 570 n.3, 88 S.Ct. at 1735 n.3.

**30.** *Id.* at 570–71, 88 S.Ct. 1731.

**31.** *Id.* at 571–72, 88 S.Ct. 1731.

**32.** Many courts have applied the *Pickering* guidelines and concluded that plaintiffs' activities in similar circumstances "were clearly within the scope of first amendment protection," *Greminger v. Seaborne,* 584 F.2d 275, 277 (8th Cir. 1978). *Greminger* involved the Board of Education's failure to renew teachers' contracts for 1975–76 because they had publicly advocated higher teacher salaries and affiliation with an organization of teachers. Although *Greminger* was decided in September 1978, approximately nine months after plaintiffs' termination, it is useful in the present case to support this Court's determination that the constitutional standard was clearly established prior to 1978. *See also Donovan v. Reinbold,* 433 F.2d 738 (9th Cir. 1970) (a city lifeguard was fired for writing a newspaper article in which he criticized activities on city beaches); *Alicea Rosada v. Garcia Santiago,* 562 F.2d 114 (1st Cir. 1977) (a Puerto Rican social worker was transferred to a new department in another area of the Commonwealth for writing a letter to her supervisor in which she criticized departmental operations and suggested possible remedies); *Donahue v. Staunton,* 471 F.2d 475 (7th Cir. 1972), *cert. denied,* 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973) (a chaplain, employed at a state mental hospital, was discharged for his public criticism of hospital operations); *Guerra v. Roma Independent School District,* 444 F.Supp. 812 (S.D.Texas 1977) (teachers' contracts were not renewed because teachers supported an unsuccessful school board candidate).

which under *Pickering* would not disrupt the maintenance of discipline by plaintiffs' superiors or harmony among co-workers.

*Pickering* makes clear that it is the nature of the employment that defines the extent to which the otherwise protected publications of employees may be constrained. The less important to the job is personal loyalty or the confidence of superiors, the weaker is the argument that special restrictions upon criticisms are proper. (391 U.S. at 570 [88 S.Ct. 1731] . . . .) The less likely it is that the public will attach special importance to the statements made by someone in a particular position, the weaker is the argument that the state needs special restrictions on false or erroneous statements made by someone in that position to prevent substantial deception of the public. (391 U.S. at 574 [88 S.Ct. 1731] . . . .)

*Donovan v. Reinbold,* 433 F.2d 738, 742–43 (9th Cir. 1970). Thus, at the time of plaintiffs' actions in 1978, it was clearly established that they had a protected constitutional right under the First Amendment to address the public concerning the DOE's failure to comply with the civil rights laws. Furthermore, under *Procunier,* defendants should have known of this right because it was an established legal principle.

■ Defendants next contend that, even if plaintiffs' public statements were within the scope of First Amendment protection, the case law at that time was such that it

precludes a finding that defendants "knew or should have known that their conduct violated the constitutional norm." *Procunier,* 434 U.S. at 562, 98 S.Ct. at 860. Defendants argue that *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) and its progeny fail to establish a clear standard that would enable the third requirement of *Procunier* to be satisfied in this case.[33]

In *Mt. Healthy,* the Supreme Court affirmed a non-tenured teacher's right to reinstatement "if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." 429 U.S. at 283–84, 97 S.Ct. at 574. The Court established a two-step process for determining whether a plaintiff is entitled to reinstatement in such a case. The Court held that

[i]nitially . . . the burden was properly placed upon [plaintiff] to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the . . . decision not to rehire him. [Plaintiff] having carried that burden, [defendant must show] by a preponderance of the evidence that [he] would have reached the same decision as to [plaintiff's] reemployment even in the absence of the protected conduct.

*Id.* at 287, 97 S.Ct. at 576 (footnote omitted).[34]

---

**33.** Defendants also contend that *Mt. Healthy* in effect eliminated the guidelines set forth in *Pickering.* Contrary to defendants' contention, the *Mt. Healthy* Court noted with approval the application of the *Pickering* balancing test in its affirmation of the district court's determination that a teacher's public comments concerning the school's dress code were protected under the First Amendment. 429 U.S. at 284, 97 S.Ct. 568.

**34.** The *Mt. Healthy* standards are not useful in deciding whether plaintiffs' speech was protected under the First Amendment. Once speech has been determined to be protected under the *Pickering* analysis, *Mt. Healthy* provides the mechanism for determining whether there has been "a constitutional violation justifying remedial action." 429 U.S. at 285, 97

S.Ct. at 575. The Court explained the rationale for its conclusion as follows:

The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Id.* at 285–86, 97 S.Ct. at 575.

The diverse applications of the *Mt. Healthy* test by various lower courts indicate that defendants should not have known "that their conduct violated the constitutional norm." In *Branch v. School District No. 7 of Ravalli County,* 432 F.Supp. 608 (D.Montana 1977), the district court held that a teacher was not entitled to reinstatement for defendant school board's refusal to renew her contract. Although plaintiff's public criticism of the school and its administration was protected under the First Amendment, the district court determined that the school board would not have renewed plaintiff's contract even "in the absence of the protected conduct." *Id.* at 611.

The decision of three board members who voted against the renewal of plaintiff's contract was premised upon their *opinion* that plaintiff was not able to adequately perform her duties as a teacher. The reasons for the decision of Board Member Buelke, who had a daughter in plaintiff's class, included his daughter's report that plaintiff spoke profanely of the principal, his irritation with plaintiff for submitting a letter written by his daughter that criticized activities at a Memorial Day Parade that she had not attended to a newspaper for publication, plaintiff's dissatisfaction with the school system as evidenced by the enrollment of her daughters in another school, and plaintiff's attempt to circumvent the school administration by presenting her complaints at school board meetings. The Court concluded that this board member's opinion that plaintiff was not a good teacher was a satisfactory reason for termination.[35]

Under the *Branch* analysis, defendants had an adequate basis for their opinion that plaintiffs were unacceptable employees. In his letters to defendant Clark recommending plaintiffs' dismissal, defendant Yamashita listed the reasons for his opinion that plaintiffs were unsatisfactory employees. He claimed that defendant Vanterpool compiled and distributed erroneous statistical summaries which showed that the DOE was not in compliance with Title IX, that he drafted unacceptable Title IX guidelines, and that he continually violated established departmental procedures and the instructions of his superiors. Defendant Yamashita also claimed that plaintiff Fujiwara continually violated the instructions of her superiors and used the DOE's copy facilities for her personal needs. Therefore, although I concluded otherwise after a full hearing,[36] the *Branch* case would support defendants' conclusion that their opinion that plaintiffs were not satisfactory workers provided adequate justification for their decision to terminate plaintiffs.

*Williams v. Day* 412 F.Supp. 336 (E.D. Ark.1976), *aff'd,* 553 F.2d 1160 (8th Cir. 1977) also supports the conclusion that defendants were unable to predict the constitutionality of their actions under the *Mt. Healthy* standard. In *Williams,* the district court determined that a high school coach's public criticism of the school's athletic program, which was constitutionally protected by the First Amendment, was not the basis for the school board's decision to fire him. 412 F.Supp. at 340 & 348. In refusing to reinstate the plaintiff, the district court found that the plaintiff had been fired for other reasons which included his refusal to comply with established administrative policies and his intentional disregard "for the attitudes and rights of others in the school 'family'" because he was unable to accept the administration's rejection of his applica-

---

**35.** The court found "from all of the evidence that, when [this board member] said he thought he could get a better all-around teacher, he was telling the truth as he saw it." 432 F.Supp. at 611. The court also concluded that the opinions of the two other board members that plaintiff was an ineffective teacher were sufficient justification for her termination. Board Member White, whose teaching philosophy differed from plaintiff's, concluded that

plaintiff was not humanistic, that she was unable to interact with people, and that her pupils did not smile enthusiastically. The basis for Board Member Clark's decision was plaintiff's failure to cooperate with the administration and her evasive answers to his questions in a meeting of the school board.

**36.** Memorandum of Decision at 17 (filed June 8, 1978).

tion for the position of school athletic director. *Id.* at 340. The Eighth Circuit, reviewing this decision in light of the Supreme Court's subsequent ruling in *Mt. Healthy*, affirmed the district court's determination that the school board's decision to fire plaintiff was "for the most mundane of personnel considerations. The decision was not in any way based upon [appellant's] exercise of his First Amendment rights." 553 F.2d at 1162 (quoting 412 F.Supp. at 340). Therefore defendants herein, relying upon *Williams*, could have concluded that plaintiffs' various actions in disregard of established DOE procedures and their refusal to comply with the specific instructions of their superiors provided sufficient justification for plaintiffs' termination despite the presence of the protected speech.

Another case that increased the uncertainty of the constitutionality of defendants' actions is *Wagle v. Murray*, 560 F.2d 401 (9th Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978).[37] In *Wagle*, a teacher alleged that his employment had been terminated because of his exercise of his First Amendment rights. A jury determined that plaintiff had been fired because of his public expression of his controversial views and awarded him $50,000. The trial judge, however, granted defendants' motions for judgment notwithstanding the verdict because, *inter alia*, he concluded that there was no evidence that plaintiff had been terminated for exercising his First Amendment rights or that defendants had acted in bad faith.

On appeal, the Ninth Circuit concluded that the jury could have inferred from the evidence either that appellant was terminated because he had exercised his constitutionally protected rights of free speech or that he was an ineffective teacher. 546 F.2d 1329, 1334 (9th Cir. 1976). This evidence included: appellant's public challenge that traditional school practices violated the separation of church and state, his public support for the legalization of marijuana, and his distribution to students of a pamphlet which compared the student-teacher relationship to a system of slavery. There was also evidence that showed that criticism of appellant's effectiveness as a teacher occurred during the periods of public controversy over appellant's statements. *Id.* at 1335. The Ninth Circuit therefore held that the judgment n. o. v. was improperly granted. *Id.* at 1334. After the Supreme Court vacated and remanded this decision for consideration in light of *Mt. Healthy*,[38] the Ninth Circuit once again concluded that there was sufficient evidence to support the jury verdict and reversed the judgment n. o. v. 560 F.2d 401, 403 (9th Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978).

The *Wagle* litigation further obfuscated the issue of the constitutionality of defendants' actions. Defendant Yamashita's letter of January 30, 1978, which set forth reasons for plaintiffs' termination, centered around plaintiffs' public criticism of the DOE's compliance with various civil rights laws and related events. Furthermore, as I previously found, none of the other reasons for plaintiffs' termination had been brought to their attention in a disciplinary context until the letter of January 30, 1978.[39] From defendant Yamashita's emphasis of these specific actions and defendant Clark's subsequent termination of plaintiffs based on defendant Yamashita's letter, a judge or jury could infer that plaintiffs were terminated for the public expression of their controversial views. Nevertheless, similar evidence in *Wagle* led the trial judge to the conclusion that no such inference could be made[40] and the Ninth Circuit to the conclu-

---

**37.** *See* note 4 *supra* & accompanying text.

**38.** 431 U.S. 935, 97 S.Ct. 2645, 53 L.Ed.2d 252 (1977).

**39.** Memorandum of Decision at 14 (filed June 8, 1978).

**40.** It is unclear whether the trial judge applied the *Mt. Healthy* standard in reaching this conclusion. The defendants in *Wagle* contended "that the comments of the district judge when he granted judgment n. o. v. establish that the judge applied the *Mt. Healthy* standard . . ." 560 F.2d at 403. The Ninth Circuit avoided this

sion that the case could come out either way.

In light of the various applications of the *Mt. Healthy* standard, defendants could not be expected to have predicted with any certainty whether their conduct would violate plaintiffs' First Amendment rights. Thus, under *Procunier*, the immunity defense is available to defendants under the first part of the *Wood v. Strickland* rule and defendants are entitled to partial summary judgment on the issue of objective good faith.[41]

Defendants must also show by a preponderance of the evidence that they are entitled to the defense of qualified immunity under the subjective good faith test of *Wood*. *Wood* provides that officials cannot escape liability for damages if they acted "with malicious intention to cause a deprivation of constitutional rights or other injury . . . ." 420 U.S. at 322, 95 S.Ct. at 1001.

Defendants argue that they are entitled to summary judgment on the issue of subjective liability on the strength of their affidavits. They contend that these affidavits, which are based upon testimony given at the injunction hearings, clearly indicate that they acted in their best judgment in their belief that the dismissal of plaintiffs was constitutionally permissible.[42] Plaintiffs respond by contending that summary judgment on this issue is inappropriate at this time because they relied on an informal agreement of the parties and a subsequent oral Magistrate's order whereby the parties deferred discovery on the issues of defendants' bad faith and liability for damages.[43]

Plaintiffs therefore have no deposition testimony or affidavits to submit on the issue of defendants' subjective good faith.[44]

Plaintiffs' argument is well taken. I conclude that summary judgment on this issue is inappropriate until there has been adequate opportunity for discovery. This ruling does not preclude either party from moving for summary judgment on this issue after discovery has been completed.

Therefore, IT IS HEREBY ORDERED that plaintiffs' motion for partial summary judgment on the issue of defendants' individual liability for damages is DENIED. Defendants' Amended Motion to Dismiss is also DENIED. Defendants are GRANTED partial summary judgment on the issue of objective good faith in their claim for qualified immunity from individual liability for damages.

---

issue by concluding that the jury was the proper trier of fact in that case and that their verdict was justified by sufficient evidence. *Id.* Nevertheless, the trial judge's determination supports my conclusion regarding the ambiguity in this area.

**41.** Partial summary judgment is appropriate because Defendants' Amended Motion to Dismiss is based on evidentiary matter outside the pleadings which falls under Rule 56 of the Federal Rules of Civil Procedure. *See* Plaintiffs' Memorandum in Opposition to Defendants' Amended Motion to Dismiss at 2 (filed March 7, 1979).

**42.** Defendants' Memorandum in Support of Motion to Dismiss and in Opposition to Motion for Summary Judgment at 44 (filed March 2, 1979).

**43.** Plaintiffs' Memorandum in Opposition to Defendants' Amended Motion to Dismiss at 2 (filed March 7, 1979).

**44.** Plaintiffs also contend that defendants' undisputed affidavits are insufficient evidence to satisfy their burden of proof and justify summary judgment on this issue. *Id.* 2–3. In view of my disposition of this issue, I decline to address this contention at this time.